McElhannon v. Coffman.

Opinion delivered March 14, 1927.

1. SUNDAY—AFFIRMANCE OF SUNDAY CONTRACT.—While a contract of sale made on Sunday is void, the parties may affirm or adopt the terms thereof on a subsequent week day, and so become bound to perform them.

2. SUNDAY—AFFIRMANCE OF SUNDAY CONTRACT.—One who purchased an automobile on a Sunday, and retained possession and used it constantly until it was taken from him by the sheriff, cannot subsequently repudiate the contract on the ground that it was executed on Sunday.

3. SUNDAY—DISAFFIRMANCE OF CONTRACT.—The fact that the vendors of an automobile sold on Sunday transferred the purchase notes to an innocent purchaser for value did not excuse or exonerate the buyer for failure promptly to notify the vendors and the purchaser of the note that the contract was void because executed on a Sunday nor for his failure to offer to return the car before he used it.

Appeal from Montgomery Chancery Court; *W. R. Duffie,* Chancellor; reversed.

*John H. Crawford, Dwight H. Crawford* and *D. F. McElhannon,* for appellant.

Appellee, *pro se.*

WOOD, J.   On December 15, 1924, Jack Coffman purchased from Fleming & McElhannon an automobile for which he paid the sum of $522.25 and executed his note in the sum of $1,045.34, to be paid in equal installments of $87.12 on the 15th day of each month thereafter. Coffman and Fleming also on that day entered into a written contract of sale, by the terms of which the title to the car was retained in the vendors until the purchase price was paid in full.   The note provided that, if any installment was not paid when due, the remaining installments would then become due at the option of the holder. The notes and written contract evidenced the contract of sale. This note and contract were transferred to the Commercial Credit Company, a Louisiana corporation, for valuable consideration before maturity.   Nothing was paid on the note by Coffman, Fleming & McElhannon, and this action was instituted by the credit company against

the appellants to recover the balance due on the note, and the plaintiff prayed that a vendor's lien be declared on the automobile and that same be held subject to the orders of the court, and that plaintiffs have judgment against the defendants in the sum of $1,045.34, and that the automobile be sold to satisfy such judgment if same were not paid. Appellant Fleming died before the institution of the action, and the action proceeded against Mrs. Fleming, as the executor of Fleming's estate, and McElhannon.

Jack Coffman, in a separate answer, denied the execution of the note and contract, and that same had been assigned to the credit company, and denied liability. He alleged that the car in controversy was purchased by him from Fleming & McElhannon on December 14, 1924, and that the note and contract upon which the action is predicated were executed on that day, which was Sunday. He therefore alleged that the contract was void. He alleged that he paid to Fleming & McElhannon the sum of $600 on that day on the purchase price of the automobile, and he prayed that the note and contract be declared void and that he have judgment against Fleming & McElhannon in that sum.

The answer of the appellants admitted the execution of the notes and contract by the appellee and that the credit company was the holder thereof for value. They alleged that Coffman was primarily liable on the note, and prayed that, if judgment be rendered against them and their codefendant, Jack Coffman, that the automobile be sold and the proceeds applied to the payment of the judgment, and that they have judgment against Coffman for any balance which they might be compelled to pay, after the proceeds of the sale were applied to the satisfaction of the judgment.

In answer to the cross-complaint of Jack Coffman they denied that the automobile was sold and delivered to Coffman on Sunday, December 14, 1924, but alleged that, if the sale had been made on Sunday, Coffman thereafter, on a week day, had ratified the same by promising to pay

for the car and by retaining possession and using the same from the time of his purchase. They denied that Coffman had paid more than had been credited on the note, and denied liability to Coffman in any sum.

The undisputed testimony was to the effect that the note and contract evidencing the sale of the car in controversy were executed on Sunday. It also showed that appellee, credit company, was a *bona fide* holder of the note, and that the note was past due. The testimony of Coffman was to the effect that, at the time he purchased the car, he paid the sum of $200 in cash and an old car, and that he should have had a credit of $600 on the note instead of $522.25. He kept the car five months. It was in good condition when the sheriff took it from him. He had not paid the note. He ran the car a couple of thousand miles. Something was the matter with it, and the sellers came up and fixed it, and he then stated to them that the car was too big and he wanted them to take it back. He offered to give them his old car and pay the $200 note to let him out. He sent the credit company a check, but stopped payment on same before it was presented. He did not tell the sellers of the car that, if they would fix it up, he would keep it. He wrote to the credit company that he would not pay any more, and wanted it to take the car. At the time he signed the note he expected to pay for the car, but changed his mind the next morning, which was Monday, and then told the sellers of the car, a week or two later, that he wanted them to take the car back. He ran the car in the meantime. He continued to run the car after the credit company asked him to pay for it, which was in January, and was running it when the sheriff came for it. Witness never had any agreement with the credit company to pay them anything at any time.

A witness on behalf of Coffman testified that he was present when Coffman and McElhannon traded cars. Coffman traded a Baby Overland which he priced to them at $400. Witness supposed they agreed to give it, as they took it away and left the new car.

Witness Ross testified for the appellees in substance that he was working for Fleming & McElhannon at the time of the sale of the car in controversy to Coffman. Coffman agreed to give his car, and executed his note for $200 for the first payment. Witness asked Coffman four or five times, at a later date, about paying for the car, and insisted on his making the payments. The first time witness saw him, Coffman had written the credit company that he was not going to keep the car, and witness was sent up there to see Coffman about it. He talked to Coffman, and Coffman agreed that he would keep it and pay for it. A few days later McElhannon had word from Coffman that something was wrong with the car, and witness and a mechanic went to see what was the matter with it, and fixed the car, and it seemed to be all right. Coffman then told witness that he would send a check the next day for what was due. On another occasion, after talking with Coffman, Coffman told witness he was going to keep the car and pay for it. In another conversation, in regard to the check which Coffman had given the credit company and which was turned down, Coffman stated that he didn't know much about the check business, and thought the checks were paid. He asked witness to have the checks sent back, and stated that he had just put· $700 in the bank, and that the checks would be paid. On cross-examination witness stated that he kept after Coffman to make his payments on the car until he said that he would "just keep the damn thing and pay for it." He never seemed angry—just made that expression, and the last time witness was at his place he said he would not pay for the car.

McElhannon testified that he sold Coffman the car in controversy, the contract of sale being evidenced by the written contract and the note. Coffman was to pay $522 cash, and he made this payment by giving a Baby Overland and his note for $200. Coffman's testimony to the effect that he traded in the car for $400 was not correct. He turned in the old car and signed a personal note for $200 and executed the note held by the credit company

in the sum of $1,045.34. Witness saw Coffman after the trade twice. Witness went to his place of business to fix the car. He talked to Coffman about keeping the car, and Coffman stated that, if they could get it fixed up in first-class condition, he guessed he might as well go ahead and pay for it. On the second trip witness talked to Coffman about keeping the car and paying for same, and Coffman stated that it was more car than he needed. Witness told Coffman that the credit company would not take the car back, but would sue him for the difference, and witness told him that it was best for him to go ahead and pay for the car. Coffman, in reply, stated that he was under the impression that the car was all that they could get, but if he knew they would give him trouble over the note, he would go ahead and pay for it. The last time witness went to see Coffman about the car Coffman drove the car all the way from his home to Caddo Gap. Coffman stated to witness that he felt like we ought to be able to handle the car out to good advantage, as it had been driven very little, showing only between four and five hundred miles on the speedometer.

Coffman was called as a witness by the credit company, and they handed him a check, dated Feb. 25, 1925, on the Bank of Caddo Gap, payable to the credit company for $174.84, and was asked if that was the check about which he had testified, and he answered that it was.

The court found that the contract was void, and that same was not ratified by the interested parties, and that the transfer of Coffman's paper to the credit company, an innocent purchaser for value, resulted in taking it out of Coffman's power to disaffirm or to recover the property. The court thereupon entered a decree in favor of Jack Coffman against the appellants in the sum of $522.56, with costs, and entered a decree in favor of the credit company against the appellants in the sum of $400, the same being the balance due the credit company on the deficiency judgment, after the application of the proceeds of the sale of the car.

This court has held that, while a contract of sale made on Sunday is void, nevertheless the parties to the contract may, on a subsequent week day, affirm or adopt the terms of the previously inoperative contract, and so become bound to perform them. *Tucker* v. *West,* 29 Ark. 386-405; *McKinney* v. *Demby,* 44 Ark. 74-78; *Fire Ins. Co.* v. *Ford,* 106 Ark. 568-570, 153 S. W. 810, 44 L. R. A. N. S. 289. In the last case we said: "In the instant case, while appellee denies that he promised to pay the note on a week day, after it was made, he does admit that the note was given in payment of a premium for a fire insurance policy issued by appellant in his favor, and that he retained the policy of insurance from the date of its issuance until the present suit was commenced. This amounted to a ratification of the contract, and appellant was entitled to recover on the notes."

Under the doctrine of these cases it was the duty of Coffman to have acted promptly if he intended to repudiate the contract for the purchase of the car on the ground that the contract was executed on Sunday, and therefore void. He could not retain possession of the car and use the same constantly, as his own testimony shows he did, from the time of his purchase until the car was taken from him by the sheriff, and then claim that he was not liable under the contract. His own testimony shows that he had run the car something like 2,000 miles in daily use of it going to and from his mill. Coffman cannot escape liability on the ground that the vendors of the car, by selling the note for the car in controversy to an innocent purchaser for value, had put it beyond his power to defend the note and therefore he was under no obligation to offer to return the car. This conduct on the part of the vendors only proved that they were treating the contract as valid and binding, and it could not excuse or exonerate appellant for his failure to act promptly in notifying his vendors and the credit company that the contract was void, nor for his failure, at least, to have offered to return the car to his vendors before he had used the same. Prompt action on his part

might have enabled the vendors to make a satisfactory adjustment with the credit company and save a loss to either. At any rate, so long as the vendors and the credit company were treating the contract of sale as valid, it certainly was incumbent upon Coffman, if he intended to repudiate such contract, to do so promptly. He could not receive the benefits of the deal and at the same time escape the burden of paying for such benefits.

The decree is therefore reversed, and the cause is remanded with directions to enter a decree in favor of the appellant against Coffman for the balance due on the note.